**In the Matter of Douglas J. SIELAFF, Debtor.**

**Bankruptcy No. 93–83685.**

United States Bankruptcy Court, W.D. Michigan.

Feb. 28, 1994.

---

James Booth Burr, Jr., Grand Rapids, MI, for Douglas J. Sielaff, debtor.

Judy L. Walton, Grand Rapids, MI, for D & N Bank.

## OPINION REGARDING APPLICABILITY OF AUTOMATIC STAY AND DEBTOR'S MOTION FOR CONTEMPT

JAMES D. GREGG, Bankruptcy Judge.

### I. *ISSUES*

There are two major issues raised in this contested matter. First, did the Debtor hold an interest in a certain vehicle which was protected by the automatic stay imposed under 11 U.S.C. § 362(a)? Second, if so, did the Bank willfully violate the automatic stay by repossessing the vehicle postpetition?

### II. *JURISDICTION*

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A) and (O). The court has authority to enter a final order in this contested matter. 28 U.S.C. § 157(b)(1). The following constitutes the court's findings of fact and conclusions of law. Fed.R.Bankr.P. 7052.

### III. *FACTS*

In October of 1989, Douglas J. Sielaff (the "Debtor") desired to purchase a 1990 Geo Storm (the "vehicle"). He went to Berger Chevrolet, located at 2525 28th Street, Grand Rapids, Michigan ("Berger"), where he negotiated the purchase of the vehicle and sought financing through Berger under an arrangement whereby his downpayment would be only $20.00. Berger told the Debtor he was not creditworthy and a cosigner would be required.

The Debtor completed a Customer's Statement (the "credit application"). Debtor's/Movant's Exh. 3. This document shows Herbert W. Sielaff, Debtor's father, as the "applicant"; the Debtor was shown as the "joint applicant or other party". The Debtor completed the financial information about his father and himself in black ink. Someone at Berger completed the middle portion of the credit application, which described the vehicle, and apparently checked the box "joint credit". The Debtor testified that he had signed the credit application, but the court is

now unable to make such a finding. First, the signature is illegible and there is no printed name below the signature. Second, the signature on the credit application looks extremely different from the Debtor's signature on the bankruptcy petition, the schedules, the statement of financial affairs, and on the Basic Car Rental Agreement. *See, e.g.,* Debtor's/Movant's Exh. 8.

The Debtor also testified that he had signed an "RD–108", i.e., an Application for Michigan Title, and a disclosure regarding the finance amount. However, the Debtor testified that he does not have copies of these documents, and he did not attempt to locate them prior to the trial of this matter.

Because the Debtor's credit was not good, D & N Savings Bank, F.S.B. ("D & N"), to which Berger sold and assigned the vehicle sales contract, *see* Creditor's Exh. E: reverse side, required that the vehicle be in the father's name with the father responsible for payments. Deposition of Herbert W. Sielaff, November 9, 1993 at 34–35 [hereinafter Depo.]. A representative of Berger or D & N took the documents to the Debtor's father to be signed. Depo. at 36; *cf.* Debtor's/Movant's Exh. 4 and Depo. Exh. 12.

The Debtor's father signed the following documents: (1) the credit application (after the earlier signature was apparently "whited out"), Debtor's/Movant's Exh. 3; (2) the D & N Motor Vehicle Installment Contract, Creditor's Exh. E; (3) the RD–108, Debtor's/Movant's Exh. 4; Depo. Exh. 8; (4) the Agreement to Provide Accidental Physical Damage Insurance, Depo. Exh. 12; and (5) although the signature is close to illegible, the GM Protection Plan document, Depo. Exh. 13. On or about November 2, 1989, the vehicle was added to the father's insurance policy and D & N (listed as Detroit & Northern Savings on the certificate of insurance) was designated as loss payee, under the loss payable clause. The Debtor testified that he paid the $20.00 downpayment and there was no trade-in of another vehicle. Debtor's/Movant's Exh. 4; Depo. Exh. 7

The RD–108 filed with the State of Michigan showed only the Debtor's father as the owner of the vehicle. The Debtor testified he first learned that his father was on the certificate of title during the holiday season in December of 1989. His father kept the title to the vehicle. Depo. at 44. The Debtor did not attempt to correct the title because he intended to make all payments and maintain possession of the vehicle.

After the sale occurred, both the Debtor and his father made payments on the vehicle. Although the Debtor intended to make all payments, he was unable to do so because of health problems. The Debtor suffered a debilitating back injury in June of 1990. As a result, he was unable to work and was required to undergo physical therapy for eight hours a day, five days each week. He was also required to visit a doctor on a weekly or semi-weekly basis.

The installment contract required the father to make sixty monthly payments in the amount of $272.82 each. After the sale occurred, the father made the following payments: (i) June 20, 1990—$817.56; (ii) July 31, 1990—$272.82; (iii) September 21, 1990—$545.64; (iv) January 4, 1991—$288.46; (v) May 5, 1993—$803.84. Depo. Exhs. 1, 2, and 3. Other than these ten payments, the Debtor made the other vehicle loan payments to D & N. However, in some instances, the Debtor made payments from monies loaned by the father for living expenses. Depo. at 14–18.

Initially the father maintained insurance coverage on the vehicle. This was done so the Debtor could take advantage of the father's "multi-fleet discount". In May of 1992, the Debtor obtained insurance coverage in his name and D & N was designated as a loss payee under that policy. Debtor's/Movant's Exh. 5. Whether this policy expired or was terminated at any time prepetition is unknown. However, on June 18, 1993, the Debtor procured insurance coverage from the Titan Insurance Company and listed D & N as the lienholder on the vehicle. Depo. Exh. 11.

Throughout the loan relationship, it is unquestioned that payments were often, if not regularly, made late. Teri Copeland, Consumer Lending Adjuster at D & N, made numerous prepetition telephonic contacts with the Debtor and the Debtor's father to

encourage or demand past due payments. The Debtor testified that Copeland had called him at his home or business at least 30 times regarding delinquent payments. Copeland admitted in her testimony that she periodically spoke to both the Debtor and his father regarding past due payments. *See also* Creditor's Exh. G. The Debtor testified that, on occasion, Copeland told him that if past due payments were not made, she would "contact his dad". The father also had conversations with a representative of D & N regarding delinquent payments in 1993; however, the father could not recall the number of such conversations, although he remembered he had spoken with Copeland. Depo. at 62–63, 68. The Debtor's father made payments to D & N when the Debtor was hospitalized and at other times per Copeland's requests.

The Debtor also testified that he had informed Copeland of his inability to make timely payments because of his medical problems. He advised the bank of his address change. The Debtor also testified he had received direct written "late notices" from the bank at his addresses; however, he failed to produce any such notices at trial. The court finds that the bank changed the address at the Debtor's request, *see* Creditor's Exh. G, notation for October 13, 1992, and sent communications to the Debtor's address.

The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 29, 1993.[1] At the time of filing, the vehicle installment payments were delinquent by two months. D & N Bank was listed as a creditor with its address designated as "460 South Saginaw, Flint, Michigan, 48502". This address is the same as appears on D & N correspondence signed by Copeland and sent to the Debtor's father. Depo. Exh. 4. Copeland, in her testimony, admitted receiving notice of the Debtor's bankruptcy case on or about August 9, 1993. *See also* Creditor's Exh. G at 6.

Near the end of August, D & N began considering the possibility of repossessing the vehicle. *See* Creditor's Exh. G at 5. During this same time period, both the Debtor and his father were in contact with the bank. On August 25, 1993, the Debtor's father called D & N, informing the bank that the Debtor still had possession of the car and either would make payments or lose the vehicle. *Id.* On August 27, 1993, the Debtor phoned Copeland to tell her that he intended to pay on the vehicle and could make one late payment the following week. Copeland informed the Debtor that he was not on the loan and that the Debtor's bankruptcy was irrelevant to D & N. *Id.* In her records of this conversation, Copeland opined that the Debtor understood D & N's position. *Id.* Also on August 27, Jerry Emmitt, Copeland's supervisor, spoke with Verna Rogge, D & N's legal specialist, who said that it would be acceptable to repossess the vehicle if payments were not received. *Id.*

Copeland left messages with the Debtor and the Debtor's father on September 7, 1993 and September 10, 1993, respectively. *Id.* at 4. After a final attempt to contact the Debtor's father on September 13, 1993, Copeland approached Emmitt, who approved repossession of the vehicle. *Id.* Copeland phoned the Secretary of State's office to verify that the vehicle was titled only in the name of the Debtor's father. *Id.*

On September 14, 1993, Premier Adjustment Services ("Premier"), on instructions from D & N, repossessed the vehicle at the Debtor's residence. *See* Creditor's Exh. C. At that time, the Debtor was delinquent on two payments toward the vehicle. Creditor's Exh. G at 3. On that same day, D & N sent the Debtor's father a certified letter informing him of the repossession and stating that he had fifteen days in which to redeem the vehicle by paying $4,170.41, the outstanding balance on the loan, plus the cost of repossessing the vehicle. Creditor's Exh. I.

Also on September 14, 1993, D & N received a letter sent by facsimile from James Booth Burr, the Debtor's attorney, after the close of business. *See* Debtor's/Movant's Exh. 6. In this letter, Burr demanded the return of the vehicle by 5:50 p.m. that same day. *Id.* Burr also stated that if D & N refused to return the vehicle within the stated time frame, he would seek damages for

---

1. The case was subsequently converted to a chapter 7 case on November 17, 1993.

contempt against D & N. *Id.* Burr's letter, originally sent to Copeland at the Flint office, was forwarded to Peter Lemmer, Senior Vice President and General Counsel for D & N. Lemmer contacted Burr and questioned the basis for Burr's assertion that the Debtor had an interest in the vehicle. Burr explained his theory to Lemmer, who indicated that he would review the matter and Burr's legal theory on the following business day. Burr, however, told Lemmer that if the vehicle were not returned by the 5:50 deadline, which was then five minutes away, Burr would file contempt proceedings against D & N.

Indeed, on September 16, 1993, Burr filed a motion to hold D & N in civil contempt for repossessing the vehicle and violating the automatic stay. *See* Motion To Hold Creditor In Civil Contempt For Violation Of Automatic Stay [hereinafter "Motion"]. By September 17, 1993, D & N had referred the matter to its law department. Creditor's Exh. G at 2. The Bank did not return the vehicle to the Debtor, apparently disagreeing with Burr's theory that the Debtor, though not on the loan documents, had an interest in the vehicle. Instead, D & N insisted upon full payment of the loan balance prior to release of the vehicle. The Debtor's father arranged for refinancing through Bell Com Credit Union and redeemed the vehicle. On September 23, 1993, the Debtor went to Premier to take physical possession of the vehicle. At that time, Miles Postema, an attorney for D & N, asked the Debtor to examine the vehicle for damage; Postema took photographs of the vehicle. Creditor's Exhs. J1–J9, K1–K4. In addition, the Debtor signed a handwritten statement of inventory items that still were missing from the vehicle. Creditor's Exh. A at 2.

Trial on the Debtor's civil contempt motion began on November 10 and was continued to and completed on November 17, 1993. The court heard testimony from seven witnesses and received twenty-one exhibits into evidence. The Debtor argued that his pay-

ments on the vehicle, which D & N knowingly accepted, gave him an interest in the vehicle and that by repossessing the vehicle after having received notice of the Debtor's bankruptcy, D & N violated the automatic stay. The Debtor seeks both compensatory damages for loss of the vehicle's use and for loss of property from and damage to the vehicle, as well as punitive damages for D & N's allegedly willful violation of the stay. D & N argued that the Debtor never had an interest in the vehicle because the Debtor's father purchased the car, signed all of the loan documents, and held title to the vehicle. In addition, D & N claimed that the Debtor suffered no loss as a result of the repossession and that D & N's actions, given the uncertain state of the law, do not warrant the awarding of punitive damages. Upon completion of trial, the court took the matter under advisement.

## IV. *DISCUSSION*

In his Motion, the Debtor asks this court to hold D & N in civil contempt for violating the automatic stay by repossessing the vehicle. The Debtor's Motion does not specifically state which subsection of 11 U.S.C. § 362 [2] protects him from repossession of the vehicle; however, argument and testimony at trial centered on the issue of whether the vehicle constituted property of the Debtor's estate. Therefore, this court concludes that the Debtor relies on § 362(a)(3) of the Code, which provides that commencement of a bankruptcy case stays "any act to obtain possession of *property of the estate* or of property from the estate or to exercise control over property of the estate."

### A. *Property of the Estate*

■ To be protected by § 362(a)(3), the vehicle must be property of the Debtor's estate. Section 541 of the Code defines those interests that fall within the definition of "property of the estate." In particular, § 541(a)(1) [3] provides, with exceptions not

---

2. Unless otherwise noted, all future statutory references are to Title 11 of the United States Code, sometimes referred to as the "Bankruptcy Code" or "Code."

3. Once again, the Debtor does not specify the subsection of § 541 on which he relies for his argument that the vehicle is property of the estate. Since no other subsection of § 541(a) applies to the facts of the Debtor's case, this court

relevant to this matter, that the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." If the Debtor has an interest in the vehicle, the interest is more in the nature of an equitable rather than a legal interest. The Debtor does not hold legal title to the vehicle. Depo. at 44. In addition, D & N's installment contract is with the Debtor's father, not the Debtor. Creditor's Exh. E.

■■ In interpreting what constitutes an equitable interest in property, this court recognizes that Congress has broadly defined property of the estate in § 541(a)(1). *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–205, 103 S.Ct. 2309, 2313–2314, 76 L.Ed.2d 515 (1983); 4 Collier on Bankruptcy ¶ 541.06 at 541–26 (15th ed.); 3 Norton Bankruptcy Law and Practice 2d § 51:4. The coverage of "property of the estate" is not without limit, and this court must decide whether the unusual circumstances of this dispute fall within or without the undefined parameters of the statutory language.

■ In determining the Debtor's property interests for § 541(a)(1) purposes, a bankruptcy court must look to state law, unless a countervailing federal interest exists.

Property interests are created and defined by state law. Unless some federal

interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (citation omitted). The Michigan Vehicle Code defines an "owner" as follows:

(a) Any person, firm, association, or corporation renting a motor vehicle or having the exclusive use thereof, under a lease or otherwise, for a period that is greater than 30 days.

(b) Except as otherwise provided in section 401a, a person who holds the legal title of a vehicle.

(c) A person who has the immediate right of possession of a vehicle under an installment sale contract.

Mich.Comp.Laws Ann. § 257.37 (West 1990) (footnote omitted).[4] Although the Debtor did not hold legal title to the vehicle [5] or have an immediate right to possession under an installment sale contract, it appears that he had the exclusive use of the vehicle for more than 30 days.[6] However, for purposes of this

---

concludes that the Debtor's argument that the vehicle is property of the estate hinges on § 541(a)(1).

4. The Michigan Vehicle Code expansively defines the term "owner" to cover as many persons and entities as possible because one underlying policy of the Vehicle Code is to prevent avoidance of tort liability by vehicle owners and operators.

5. *See Wood v. Merchants Ins. Co.*, 291 Mich. 573, 289 N.W. 259 (1939) (In this case, decided under an earlier version of the current Michigan Vehicle Code, the Michigan Supreme Court held that title alone did not conclusively determine ownership of a motor vehicle.)

6. The following exchanges between Miles Postema, attorney for D & N, and Herbert Sielaff, the Debtor's father, and between James Booth Burr, the Debtor's attorney, and Herbert Sielaff indicate that the Debtor had exclusive use and possession of the vehicle since its purchase in 1989:

"Q. [by Miles Postema] Have you ever driven the car?
A. [by Herbert Sielaff] No.
Q. Never have driven it?
A. I have never driven the car."
Depo. at 39.
"Q. [by Miles Postema] Well, did you have any understandings with D & N or Berger other than that?
A. [by Herbert Sielaff] I had no negotiations with D & N or Berger, but, initially, it was—it was agreements, as I understand. The agreement was made that Doug would receive the payment books and he would make the payments and he would drive the car. There was no question about that from the very beginning."
Depo. at 41.
"Q. [by James Booth Burr] You've testified earlier that you've never driven the car; is that correct?
A. That's correct.

opinion, it is not necessary to decide whether exclusive use of the vehicle for 30 days *by itself* creates a property interest under § 541(a)(1) of the Bankruptcy Code [7]; several other factors exist, in addition to exclusive use and possession of the vehicle, which lead this court to conclude that the Debtor had an equitable interest in the vehicle both upon commencement of the case and at the time of its repossession by D & N.

First, although the Debtor often made late payments, approximately three-quarters of the payments actually made on the vehicle were made directly by the Debtor.[8] The Debtor's father paid ten of the installments on the vehicle between 1990 and late 1993 when D & N repossessed the vehicle. *See* Depo. Exh. 1. In addition, the Debtor's father loaned the Debtor an indeterminate sum of money for living expenses, part of which was used by the Debtor to make direct payments to D & N on the installment contract. Depo. at 14–19. However, D & N has failed to show that the Debtor's father, and not the Debtor, made all or substantially all of the motor vehicle installment payments.

Second, and most important, is D & N's admitted awareness and acceptance of the Debtor's arrangement with his father for payment and possession of the vehicle.[9] D &

N's internal documents show repeated contacts and negotiations for payment with both Herbert and Douglas Sielaff. D & N knew that the Debtor had possession of the vehicle and that the Debtor's father, although listed on the loan, intended that his son pay for and drive the vehicle. D & N's internal record of activity on Herbert Sielaff's account contains the following notation: "Cust [Customer's] Son Doug Has Vehicle & Makes Pmts [Payments]." Creditor's Exh. G. The Debtor's home and business phone numbers follow this notation. Notations by a bank collection officer reveal that D & N was negotiating with and expecting payment from the Debtor, not the Debtor's father, as early as the Spring of 1990. For example, a handwritten notation dated May 2, 1990 states that "[t]his boy has several businesses will get $ due him and can get utd [up to date] by eom [end of month]." *Id.* Another notation made little more than a month later, on June 13, 1990, states the following: "Doug had accident … been in hospital will call end of week to let me know payment arrangements." *Id.*

If D & N had been relying solely on Herbert Sielaff for payment on the vehicle, why did it not repossess the vehicle much sooner, especially given the continued record of late payments and statements made by

Q. Have you ever indicated that someone else should be able to drive that car other than Doug?
A. I don't ever recall even discussing the matter.
Q. And approximately how far is your home from Grand Rapids [location of the vehicle at the time of repossession]?
A. I think approximately 140 miles."
Depo. at 98–99.

7. Although not called to decide the issue on the facts of this particular matter, this court does note that mere possession alone would not necessarily give rise to a property interest cognizable under § 541 of the Bankruptcy Code. In explaining the scope of § 541(a)(1)'s definition of property, Congress used the term "possessory interest," not "possession". *See* S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), 1978 U.S.C.C.A.N. 5787, 5868. A possessory interest is a "[r]ight to possess property by virtue of an interest created in the property though it need not be accompanied by title…." BLACK'S LAW DICTIONARY 607 (5th ed. 1983). When read against the backdrop of § 541(a)(1), which refers to equitable interests, this court concludes that a

possessory interest refers to cases in which the debtor has some *right* to possess the property, for example, by virtue of the title holder's consent or permission. Thus, a thief, who could have bald possession of property, without any corresponding right to possession, likely would be unable to use § 541 to claim that the stolen property constitutes property of the estate because he lacks a legal or equitable interest.

8. In addition, the Motor Vehicle Installment Contract shows a $20 downpayment, which the Debtor apparently made. Creditor's Exh. E; Depo. at 51.

9. This court recognizes that banks receive hundreds of payments per day towards loans made to borrowers for cars, homes, and other types of real and personal property. If payments are timely made on an account, it is extremely doubtful that a bank will know whether the customer on the account or some third party actually is making the loan payments. If D & N had been unaware of the Debtor's payments on the vehicle, and had not made arrangements with the Debtor for late payments, this case might have been decided differently.

Herbert Sielaff to the effect that he did not intend to pay on the vehicle? A handwritten note made by a D & N collection officer on May 9, 1990 states that the Debtor's "father in Livonia said he would have Doug pay. He has money but won't pay. 'It won't teach the kid responsibility.'" *Id.* On February 25, 1992, Herbert Sielaff reiterated his intention not to pay on a vehicle for which he felt his son was financially responsible: "SW [spoke with] Herbert, He Not Concerned ABT [about] CR [credit] Rating, He NT [not] Going To Make Any Pmts [payments] on it." *Id.* Thus, even though D & N's motor vehicle installment contract listed Herbert Sielaff as buyer of the vehicle, D & N's conduct strongly compels the finding that it viewed the Debtor as the ultimate purchaser of the vehicle.[10]

Third, at the time of the vehicle's repossession, the insurance policy on the vehicle listed the Debtor as the insured and regular driver of the vehicle. The Debtor had purchased this insurance, effective June 18, 1993, from the Mike Kerr Agency; the policy listed D & N as the lienholder on the vehicle. Depo. Exh. 11. In addition, the Debtor had earlier purchased insurance on the vehicle from Imperial Midwest Insurance Company; that policy listed the Debtor as the insured and D & N as the loss payee, and covered the period from May 15 through November 15, 1992. Debtor's/Movant's Exh. 5. D & N's internal collection records during this six-month period show that the Debtor called on September 29, 1992 to inform the bank that he would be faxing a copy of his insurance to D & N. *See* Creditor's Exh. G. Thus, D & N knew that the Debtor was the only person listed as an insured driver on the vehicle, at least for the six-month period from May through November of 1992. Therefore, this court concludes that on the basis of the specific facts of this particular matter that the Debtor had an equitable interest in the vehicle as of the commencement of the case.[11]

### B. *Contempt or Willful Violation of the Stay*

■■ Since the vehicle is property of the Debtor's estate, this court must decide whether to award damages to the Debtor because D & N repossessed the vehicle. The Debtor may prevail on the issue of damages if this court either finds D & N in civil contempt,[12] or concludes that D & N willfully violated the stay, pursuant to § 362(h).[13] The court notes that the standards for finding a creditor in civil contempt are substantially the same as those for finding a violation of § 362(h). Essentially, a party must establish two elements: "(1) there must exist a specific and definite court order which has

---

**10.** D & N's internal record of collection activity on Herbert Sielaff's account is replete with communications between collection officers and the Debtor, a number of which D & N initiated. *See, e.g.,* Creditor's Exh. G, notations for June 22, 1992 (called Doug's [Debtor's] home and left message); June 29, 1992 (called Doug's home and left message); July 3, 1992 (called and spoke to Doug at his home); August 25, 1992 (called Doug's home and left message); March 31, 1993 (called Doug's home and left message); April 15, 1993 (called Doug's home and left message); May 3, 1993 (called Doug's home and left message).

**11.** For other bankruptcy court decisions finding an equitable interest in a vehicle despite the absence of the debtor's name on the vehicle's title *see Rutledge v. Toyota Motor Credit (In re Rutledge),* 115 B.R. 344 (Bankr.N.D.Ala.1990), *aff'd,* 121 B.R. 609 (N.D.Ala.1990) (applying Bankruptcy Code and Alabama Code to issue of ownership of an automobile); *Bernstein v. Sommer (In re Sommer),* 28 B.R. 95 (Bankr.D.Colo. 1983) (applying Colorado law and the Bankruptcy Code to conclude that title, by itself, does not determine ownership of an automobile); *In re Gunder,* 8 B.R. 390 (Bankr.S.D.Ohio 1980) (applying Bankruptcy Code and Ohio law to conclude that a debtor may have an equitable interest in a vehicle even if his name does not appear on the title); *Zimmerman v. Plaksin (In re B & P Distribs., Inc.),* 1 B.R. 426 (Bankr.E.D.Pa.1979) (title to a vehicle creates only a rebuttable presumption of ownership under New Jersey law).

**12.** *See Schewe v. Fairview Estates (In the Matter of Schewe),* 94 B.R. 938, 946–48 (Bankr. W.D.Mich.1989) for a discussion of a bankruptcy court's power to award damages for civil contempt.

**13.** Section 362(h) of the Bankruptcy Code provides that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h).

been violated and (2) the person who violated the order must have prior knowledge of it." *Schewe v. Fairview Estates (In the Matter of Schewe)*, 94 B.R. 938, 946 (Bankr.W.D.Mich. 1989) (citations omitted). Element one is easily satisfied in this case: by repossessing the vehicle, D & N violated this court's earlier Order and Notice of Stay, dated July 29, 1993. Debtor's/Movant's Exh. 10. Element two also is satisfied. D & N received notice of the Debtor's filing for bankruptcy. Creditor's Exh. G at 6. Moreover, D & N knew that the bankruptcy filing had some impact on Herbert Sielaff's account because notice of the Debtor's filing is listed on D & N's internal collection records for Herbert Sielaff's account. *See id.* Thus, D & N had notice of the filing and connected the Debtor's bankruptcy to the proper account at its bank.[14] Therefore, this court holds D & N in civil contempt for violating the automatic stay.

## C. *Requested Compensatory and Punitive Damages*

The Debtor claims the following items of damage as a result of the repossession: (1) $320.11 for rental cars; (2) $400 in lost rental payments; (3) $326.90 for a front-end alignment and repair of lower control arm bushings; (4) $1047.00 for general body repairs, repainting of vehicle, and replacement of door locks; and (5) compensation for an additional 305 miles driven on his vehicle. In addition, the Debtor asks for punitive damages and reasonable attorney fees.

### 1. *Rental Cars*

■ D & N repossessed the vehicle on September 14, 1993. On that same day, the Debtor rented a car from Basic Car Rental ("Basic"). Rent on the car for one week cost $174.72. *See* Debtor's/Movant's Exh. 8. The

Debtor returned the Basic car on September 21, one day after renting another car from Dollar Rent A Car ("Dollar"). The Debtor returned the Dollar car on September 24, 1993, one day after regaining possession of his vehicle. Charges for renting the car from Dollar totalled $145.39.

The Debtor testified at trial that he needed a car to travel to work and to his medical appointments.[15] D & N did not refute the Debtor's need for a vehicle; instead, D & N argued that it should not have to reimburse the Debtor for the one-day overlap between the Debtor's rental of the Dollar car and return of the Basic car, and the one-day overlap between regaining his vehicle and return of the Dollar car. A one-day delay in returning a rental car is not excessive. Thus, this court concludes that the Debtor did not act unreasonably with regard to returning the rental cars and awards compensation of $320.11 to reimburse him for the charges on these two rental vehicles.

### 2. *Missing $400 in Rent Proceeds*

■ David L. DeVries, of Premier Adjustment Services, repossessed the Debtor's car in the early morning of September 14, 1993. DeVries testified that after repossessing the vehicle, he and an assistant conducted a repossession analysis, which entailed an inspection of the vehicle's condition, both inside and out. Creditor's Exh. D. In addition, DeVries and his assistant conducted an inventory of the items inside the Debtor's car, Creditor's Exh. B; small items were placed in black plastic bags while larger items, such as the Debtor's baggage carrier, were placed in an unlocked storage room. DeVries testified that he and his assistant removed a deposit bag from the vehicle and listed that item as "1–Bag" on the inventory. Creditor's Exh.

---

**14.** This matter is distinguishable from one in which a bank receives notice of a bankruptcy filing but is unable to readily locate any account records bearing the debtor's name. If the debtor's name does not surface in a routine check of a bank's accounts, the court believes a bank would not be obligated to conduct an exhaustive search in order to track down some account on which the debtor makes payments under another borrower's name. Such factual findings would likely negate the "prior knowledge" element or,

at best, support a holding of a technical, as opposed to a willful, violation of the stay. See § 362(h).

**15.** D & N's internal collection records indicate that in 1992 the Debtor informed the bank that he had been injured in an accident. *See* Creditor's Exh. G, notation for March 30, 1992; *see also supra* Part III of this opinion for a discussion of the Debtor's 1990 injury.

B. In addition, DeVries said that he opened the bag, but that there was no currency inside.

On September 14, 1993, the Debtor and a friend paid a visit to Premier. The Debtor signed a release stating that he had "receive[d] all personal property that was in the car at the time of repossession." Debtor's/Movant's Exh. 9. However, the Debtor claims that he only signed the release because he wanted what Premier had in its possession on September 14, not because he had received all of his belongings from the vehicle.

The Debtor also completed a list of items that were not on Premier's inventory check list [16]; the Debtor's list included the following items: (1) color television; (2) fuzz buster; (3) 120 volt converter; (4) portable dolly; and (5) a "deposit bag w/ chks and deposit slips." Creditor's Exh. A at 1 [hereinafter "First Checklist"]. The Debtor apparently received both the deposit bag and the portable dolly from Premier on September 14, 1993 because the Debtor's Motion, filed with this court on September 16, 1993, listed only the color television, the fuzz buster, the 120 volt electrical adaptor, and $400 in cash as missing. *See* Debtor's Motion at ¶ 12.

On September 23, 1993, the Debtor returned to Premier to take possession of his vehicle. DeVries, his assistant, his secretary, and Miles Postema were present. When asked to list those items that still were missing from his vehicle, the Debtor wrote "# 1 Registration." He started to write # 2 but crossed that off and listed no other items. This list was in the Debtor's own handwriting, was signed by the Debtor, and dated 9–23–93. Creditor's Exh. A at 2 [hereinafter "Second Checklist"]. The Debtor does not dispute that all three of the other items on the Debtor's First Checklist that had not

been returned on September 14 were returned to him on September 23.

The Debtor claims that he had $400 in the deposit bag left in his vehicle; however, when he completed the First Checklist he failed to mention the $400. He listed the deposit bag and even described its contents as including checks and deposit slips. If the Debtor took the time to describe deposit slips and checks, why did he not list $400 in cash, a substantial sum of money to an individual who has filed for bankruptcy relief, as part of the bag's contents? The Debtor, not Premier, prepared the First Checklist. Thus, the Debtor cannot place responsibility on Premier for failing to properly identify property of which only he had knowledge.

The court also notes that the Debtor failed to list the $400 as "still missing" on the Second Checklist. The court finds the Debtor's testimony on this item of damage is not credible. The Debtor claims that Postema only would allow him to write down on the Second Checklist those items from the First Checklist that still were missing. Postema, of course, refutes this assertion. The problem with the Debtor's explanation is that the registration, which he listed as still missing on the Second Checklist, is *not* listed on the First Checklist. If Postema limited what the Debtor could list on the Second Checklist to the items originally placed on the First Checklist, then the Debtor should not have been able to list his registration on the Second Checklist because it was not on the First Checklist.

On the facts presented, this court concludes that the Debtor is not entitled to damages for the $400 allegedly missing from the deposit bag. The documents presented in court do not establish that the Debtor had $400 in his deposit bag, which turned up missing after the vehicle's repossession. In addition, the Debtor's testimony on this mat-

---

**16.** At trial, the Debtor testified that Creditor's Exh. B, Premier's inventory checklist, did not look like the list shown to him when he first visited Premier Adjustment Services. The court gives little weight to this testimony. The Debtor examined some inventory checklist while on Premier's premises. The Debtor also prepared his own list of items not listed on Premier's inventory; that list included the deposit bag in which

the $400 supposedly was located, but did *not* include any reference to $400 in missing cash. Thus, whether Exhibit B is actually the inventory prepared and shown to the Debtor upon his first visit to Premier is not significant; what is significant is that the Debtor failed to list the $400 on *his own* list of items still missing from the vehicle.

ter was not credible. No compensation is awarded for the alleged missing rental proceeds.

### 3. *Front–End Damage to Vehicle*

■ The Debtor also claims that Premier damaged the front end of his vehicle during the repossession. On October 13, 1993, he took his vehicle to Berger for a damage appraisal. Jeff Allen, a service counselor for Berger, testified at trial that the Debtor had told him that the vehicle had been towed improperly. An estimate of the repairs needed to replace two lower control arm bushings on the front end of the vehicle and to realign the front end of the vehicle totalled $326.90 Debtor's/Movant's Exh. 1. Allen also testified that the damage to the vehicle's bushings ordinarily would not occur during normal driving, unless the driver hit a very large bump or deep hole. Other than observing the vehicle while the service technician examined the vehicle, Allen did not conduct a detailed inspection of the damage to the vehicle's front end. In fact, Allen is not a state-certified mechanic and does not work as a mechanic for Berger.

In addition, Allen's own testimony draws into question whether Premier's repossession was the cause of the front-end damage to the Debtor's vehicle. On cross-examination, Allen stated that if bushings were cracked or split on a car, as in the case of the Debtor's vehicle, the driver would notice the problem within three to four days, depending on the number of miles driven. The Debtor regained possession of the vehicle on September 23, 1993. On September 30, 1993, the Debtor took his vehicle to Grandville Auto Body for an appraisal of the damage allegedly done to the vehicle's locks and exterior by Premier's repossession. Mark Hense of Grandville Auto Body appraised the damage at $1,047. The Debtor did not take his vehicle in for an estimate of repairs needed on the front end until October 13, 1993.

Given the facts presented and the testimony of the Debtor's own witnesses, the court concludes that the Debtor failed to show, by a preponderance of the evidence, that Premier's repossession caused the damage to the front end of his vehicle. The Debtor's behav-

ior suggests to the court that something besides Premier's repossession caused the damage to the front end of his vehicle. As the Debtor's own witness Allen stated, the Debtor would have noticed the effect of a cracked or split bushing within three to four days. As a result, the court questions why the Debtor would take his vehicle in for an appraisal of damage to the locks and paint within one week of regaining possession, but wait almost three weeks to obtain an appraisal of the repairs needed to correct a fairly serious structural problem with the front end of the vehicle. Accordingly, no compensation is awarded for asserted front-end damage to the vehicle.

### 4. *Impermissible Use of Vehicle*

■ The Debtor also claims that between September 14, 1993, when Premier repossessed the vehicle, and September 23, 1993, when the Debtor regained possession, some unknown person drove his vehicle an additional 305 miles. The Debtor testified that he resets the odometer on his car each time he fills the car with gasoline, and that 220 miles is the maximum number of miles that would show on the odometer between refilling the vehicle's gas tank. Besides his testimony, the Debtor offered no other evidence on the additional mileage, such as gas receipts or mileage logs.

After repossession, the vehicle was taken from the Debtor's residence on Bissell to Boston Lock & Key; in addition, DeVries admits driving the vehicle from Boston Lock & Key on Kalamazoo and Hall in Grand Rapids to Premier's lot in the 5800 block of South Division in Grand Rapids. In addition, DeVries admitted that he had driven the vehicle and stored it at his own residence because, in the past, vehicles containing electronic equipment had been damaged at his lot. DeVries stated that the distance from the Premier lot to his home was five miles, and that he had driven the vehicle to the Premier lot on two different occasions.

After listening to the testimony and observing the demeanor of both the Debtor and DeVries, based upon comparative credibility, the court gives greater weight to the Debtor's version of the facts on this issue. The

court does not believe DeVries's explanation regarding driving the vehicle to his *residence* to be stored "to protect the equipment". The vehicle should have been securely stored at a lot and not driven by DeVries. There was no credible testimony that the vehicle needed to be driven to preserve the collateral or its value. DeVries could have towed the vehicle to a storage lot and left it there until disposition or redemption. In short, the court believes the Debtor's version of the facts that the vehicle was impermissibly and unnecessarily driven by DeVries or other unknown persons. Thus, the court awards the Debtor $76.25 in compensation for the additional 305 miles driven by DeVries, or other unknown persons, after D & N repossessed the vehicle.[17] *See* Mich.Comp.Laws Ann. § 440.9207(1), (3) and (4) (West 1967).

### 5. *Damage to Locks and the Vehicle's Body*

■ On September 30, 1993, the Debtor took his vehicle to Grandville Auto Body for an appraisal of damage allegedly done by Premier to all of the vehicle's locks and to the surface of the car's body. Grandville Auto Body appraised the damage at $1,047. Debtor's/Movant's Exh. 2.

The Debtor claims that Premier damaged the right and left door locks, the trunk lock, and the door moldings. During trial, this judge, with permission of both parties, physically inspected the vehicle. There was no problem whatsoever with the door and trunk locks; they all functioned properly. However, there were numerous minor scratches around the right and left door moldings. Nonetheless, the Debtor has failed to prove, by preponderance of the evidence, that Premier, as D & N's agent, caused the scratches during or after the repossession.

On September 23, 1993, the Debtor had the opportunity to examine the vehicle and list, in writing, any problems with its condition. Postema took photos of problems noted by the Debtor at that time. Creditor's

Exhs. J–1 through J–9, K–1 through K–4. Not one of the photos is of the door moldings of the car. Postema testified that the Debtor pointed to two items of damage to the car: a long scratch across the right front hood, *see* Creditor's Exh. J–6, J–7, and a dimple dent on the front panel on the driver's side of the vehicle, *see* Creditor's Exhs. J–8 and J–9. If there was damage to the door moldings, simply opening the doors to the vehicle would have revealed this damage; the scratches observed by the court were readily apparent upon opening the vehicle's doors. In addition, in two photos taken by Postema, the driver's side door *is* wide open. *See* Creditor's Exhs. J–8 and J–9. If there was new damage to the door moldings, the court questions why the Debtor did not identify that damage on September 23, 1993, when Postema could have recorded that damage with a camera. Accordingly, this court concludes that the Debtor has not shown, by a preponderance of the evidence, that the scratches to the vehicle's door moldings and the alleged damage to all of the vehicle's locks were caused by Premier's repossession or storage of the vehicle.

The Debtor also claims that Premier scratched the roof and right-hand side of the hood of his car, as well as dented the front panel on the driver's side of the car. As for the damage to the roof of the vehicle, once again the Debtor failed to identify this damage on September 23, 1993, when he regained possession of the vehicle. Thus, the court will not award damages for any scratches to the roof of the Debtor's vehicle.

The Debtor, however, did point out both the hood scratch and the driver's side dent to Postema, who took photos of the damage. *See* Creditor's Exhs. J–6 through J–9, K–1 through K–4. The issue, however, is whether this damage occurred prior to or as a result of the vehicle's repossession. DeVries testified that on September 14, after repossessing the vehicle, he was present while his assistant conducted a physical inspection of the vehicle's condition. The assistant com-

---

**17.** Federal Rule of Evidence 201(b) provides that a court may take judicial notice of facts that either are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to

sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The court takes judicial notice that the Administrative Office of the United States reimburses mileage at $.25 per mile.

pleted a Repossession Analysis, Creditor's Exh. D, which consisted of checking boxes showing the condition of the vehicle's exterior, interior, glass, tires, equipment, and mechanical condition. The exterior analysis is broken down into two categories: condition of the metal and condition of the paint. Under condition of the paint, the assistant checked off "chip" and/or "scratch" for the following parts of the vehicle: (1) hood; (2) left-front fender; (3) left-front door; (4) left-rear fender; (5) rear bumper; (6) right-rear fender; (7) right-front door; and (8) right-front fender.[18] Creditor's Exh. D. The only portions of the vehicle's paint job that the assistant checked as "OK" were the front bumper, grill, and trunk lid/bed. *Id.* In addition, under metal, there is a check for a small dent to the left-front (or driver's side) fender. *Id.* Thus, the damage identified by the Debtor on September 23—the dent to the driver's side front panel and the scratch across the right-hand side of the hood—existed on September 14, after the repossession. (The court will not award compensation for the repair or repainting of the other scratches and chips to the paint's surface that are identified on the Repossession Analysis because the Debtor failed to identify these on September 23, 1993, when he regained possession of the vehicle.)

The issue, then, is whether Premier caused this damage *during* the actual repossession or storage of the vehicle. DeVries testified that no chains were placed on either the hood or roof of the car during repossession. In fact, DeVries's description of the actual repossession of the vehicle cannot account for the hood scratch and front panel dent to the Debtor's vehicle. Given the Debtor's almost total lack of credibility on a number of disputes related to damages allegedly stemming from the vehicle's repossession, the evidence of the vehicle's condition immediately after repossession, and the Debtor's failure on September 23, 1993 to identify all but two of the many asserted items of damage to the vehicle for which he now seeks reimburse-

ment, *see* Debtor's/Movant's Exh. 2, this court concludes that the Debtor has failed to demonstrate, by a preponderance of the evidence, that Premier caused the damages to the vehicle during the repossession or while the vehicle was stored in Premier's possession.

### 6. *Punitive Damages*

█ Despite the Debtor's apparent penchant for profit in this matter, the court absolutely declines to award any punitive damages. D & N made an error in repossessing the vehicle rather than seeking modification of the automatic stay; it took a calculated risk when it decided that the stay did not preclude repossession of the vehicle. *Kearns v. Orr (In re Kearns)*, 161 B.R. 701, 705 (D.Kan.1993) (citations and footnote omitted) ("If there is uncertainty as to whether the automatic stay applies, the prudent practitioner should petition the court for clarification.... Otherwise, he or she takes a calculated risk of being held in contempt."); *Brock v. Barlow (In the Matter of Brock )*, 58 B.R. 797, 804 (Bankr.S.D.Ohio 1986) (determinations about the applicability of the automatic stay "belong exclusively to the bankruptcy court and in the absence of an order of relief entered by the bankruptcy court a creditor and creditor's counsel proceed at their peril.")

However, D & N's conduct was not egregious. *See Crysen/Montenay Energy Co. v. Esselen Assocs. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2d Cir.1990) (punitive damages warranted where court finds malicious conduct or bad faith by the creditor violating the stay); *Farmers Home Admin. v. Ketelsen (In re Ketelsen)*, 880 F.2d 990, 993 (8th Cir.1989) (citations omitted) ("egregious, intentional misconduct on the violator's part is necessary to support a punitive damages award."); *see also Kearns v. Orr (In re Kearns)*, 161 B.R. at 705. D & N honestly, albeit mistakenly, believed that the Debtor had no legal or equitable interest in

---

**18.** Grandville Auto Body's appraisal also includes clear coating and buffing out the entire vehicle. Given the scratched condition of the vehicle as shown on the Repossession Analysis and the Debtor's failure to identify most of this damage on September 23, when he regained possession of the vehicle, this court will not award compensation for clear coating or buffing of the vehicle.

the vehicle which was protected by the automatic stay. Further, the court finds that D & N did not act in contravention of settled law. Prior to this decision, no reported bankruptcy cases existed which interpreted Michigan law and held that a debtor who possesses a vehicle, but is not listed on the vehicle's title, has a property interest recognized under § 541 of the Bankruptcy Code. All of the case law cited by the Debtor is from other jurisdictions. See *supra* note 11. Finally, given Peter Lemmer's credible testimony, the court believes, given all the circumstances, that the Debtor's demand to D & N to relinquish the repossessed vehicle on a moment's notice, under penalty of contempt and possible award of punitive damages, was unreasonable. Given the unsettled state of the law, the Debtor should have been somewhat more conciliatory in an attempt to resolve this matter before filing his motion.

### 7. Attorney Fees

Although the Debtor has requested reimbursement of attorneys' fees, there was no proof submitted at trial. An individual debtor injured by a creditor's willful violation of the stay is normally entitled to costs and reasonable attorneys' fees as an element of damages. In this matter, the Debtor must first submit the requested fees to the court, which will allow D & N an opportunity to object to any fees it considers inflated, unnecessary, or unreasonable. *Cf. Archer v. Macomb County Bank*, 853 F.2d 497 (6th Cir.1988).

The Debtor's counsel shall prepare an itemized statement of any requested costs and attorneys' fees and file it with the court within twenty (20) days of the date of service of this opinion. A copy of the statement will be contemporaneously served upon D & N's attorney of record. D & N shall then be afforded fifteen (15) days to object to any requested costs and attorneys' fees.

If the Debtor's counsel fails to timely file such an itemization, no fees shall be awarded. If D & N's counsel fails to timely object to the requested costs and fees, all attorneys' fees requested by the Debtor's counsel shall be awarded. In the event of a timely filing and objection, the court will schedule a hearing to award the appropriate amount of costs and attorneys' fees.

### V. CONCLUSION

The court concludes, under the unique facts of this dispute, that the Debtor has shown an equitable interest in the vehicle; thus the vehicle is property of the estate. By repossessing the vehicle, after having received notice of the Debtor's bankruptcy filing, D & N violated the automatic stay. The court now awards the Debtor $396.36 in damages, which consists of reimbursement for two rental cars and additional mileage put on the car as a result of the repossession. The court believes that the unsettled state of the law in this area makes this dispute an inappropriate one for awarding punitive damages to the Debtor. Finally, the court may award the Debtor reasonable attorneys' fees and costs at a subsequent date, after the Debtor submits an itemized statement for, and the court hears any objections to, those fees.

No order shall be entered at this time. After attorneys' fees and costs, if any, are awarded, a final order consonant with this opinion shall be prepared and entered by the court.